UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>PATRICK WAYNE ANDERSON,<br><br>　　　　　　　Defendant. | Case No. 1:21-cr-00089-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court are Defendant Patrick Wayne Anderson's Motion to Suppress (Dkt. 23) and the Government's Motion in Limine to Exclude DUI Field Sobriety Expert (Dkt. 38). The Court held an evidentiary hearing on May 18–19, 2022. For the reasons set forth below, both motions are denied.

## II. BACKGROUND

### A. Factual Background

On February 19, 2021, at 10:32 p.m., a concerned citizen ("reporting party") called the Caldwell Police Department ("CPD") to report a potential drunk driver. The reporting party stated a small, dark blue SUV with Washington plates had "struck a curb and was swerving all over the roadway." Dkt. 23-1, at 1. The reporting party followed the SUV as its driver pulled over and parked in front of an O'Reilly Auto Parts store. The reporting party also parked and waited until police arrived. Dkt. 46, at 26:10–25.

Officer Peccorini of the CPD arrived at the scene at approximately 10:41 p.m. and

observed a blue 2004 Ford Escape with Washington plates parked in front of the O'Reilly's, which was closed at the time. At 10:42 p.m., CPD Officer Watkins arrived to provide cover for Peccorini. Peccorini then approached the SUV, which was not running,[1] and saw a single male, later identified as the defendant, Patrick Wayne Anderson, in the driver's seat. Peccorini asked Anderson what he was doing. Anderson responded that he had just driven to Idaho from Moses Lake, Washington, and was trying to get ahold of a friend who lived in the area. Peccorini advised Anderson that a reporting party had observed him swerving on the roadway. Anderson admitted that he had been weaving but stated he did so because he was tired and had just driven through a snowstorm. Anderson denied drinking any alcohol.

While Anderson was still seated in his vehicle, Peccorini  performed a "modified" Horizontal Gaze Nystagmus test ("HGN test"), which looks for an involuntary jerking of the eyes—an indicator of whether an individual is under the influence of alcohol or drugs. Dkt. 27, at 4. Peccorini observed some nystagmus at maximum deviation in both of Anderson's eyes, which is a sign of impairment. Dkt. 23-2, at 2. Peccorini also reported that Anderson's eyes were slightly bloodshot. *Id*. However, Peccorini informed Anderson that while he saw some evidence of impairment in his eyes, the impairment was not enough to charge Anderson with a DUI. Peccorini told Anderson to "sit tight" and stated he would be right back. Dkt. 23-4, at 2:07–08.

Peccorini returned to his patrol vehicle and called the reporting party to obtain

---

[1] Although the car was not running, Anderson confirmed the keys were in the ignition. Dkt. 23-4, at 1:38.

additional information. The phone call was recorded through Peccorini's body camera. Peccorini told the reporting party that although Anderson showed some signs of impairment, he did not have enough to charge Anderson with a DUI. Peccorini asked the reporting party if he would like officers to nevertheless proceed with a DUI investigation. The reporting party responded that he would like officers to proceed with a DUI investigation based on the extent of Anderson's erratic driving, and confirmed he would sign a complaint for DUI if Peccorini found additional grounds to support that offense.

Peccorini then reapproached Anderson's car and stated he wanted to take Anderson outside for some Field Sobriety Tests ("FSTs"). As Anderson stepped out of his vehicle, Peccorini noticed an empty pistol holster on Anderson's right hip. Peccorini asked Anderson where his gun was located and Anderson responded, "my BB—under the seat." Dkt. 23-6, at 5:18–:19. From Peccorini's experience, it was unlikely that an adult man would carry a BB gun in a handgun holster. Dkt. 46, at 59:1–15.

Officer Peccorini then proceeded to conduct three FSTs. He first performed the standard version of the HGN test. Peccorini noticed a lack of smooth pursuit and distinct and sustained nystagmus at maximum deviation in both of Anderson's eyes, as well as a distinct nystagmus onset prior to 45 degrees in Anderson's left eye. Dkt. 23-2, at 2. This resulted in Anderson scoring 5 out of 6 decision points on the HGN test, which is a failing score.

Peccorini next conducted a "walk and turn test," which required Anderson to take a series of steps in a straight line, and to then turn and walk back to the starting area. Anderson passed the walk and turn test.

Finally, Peccorini performed the "one leg stand test." Peccorini asked Anderson to follow his instructions by holding one leg out in front of him and counting. Anderson set his foot down before he completed the designated time period, and also raised his arms, thus failing the one-leg stand test. Peccorini advised Anderson that he was going to be detained for a breathalyzer. Dkt. 23-6, at 10:52–:54. Peccorini explained, "based on those tests I do think you are under the influence of something." *Id*.

Peccorini handcuffed Anderson and took him to his patrol car. As they stopped in front of Peccorini's car, Watkins asked Anderson, "what kind of gun do you carry man?" *Id*. at 11:38. Anderson responded, "a couple of them." *Id*. at 11:41. Peccorni asked Anderson if he had a couple guns inside his vehicle. Anderson responded "no." *Id*. at 11:45. Watkins made a joke, at which both Anderson and Peccorini laughed. *Id*. at 11:49–:51. Peccorini then told Anderson to have a seat in the patrol car, and explained he needed to wait for fifteen minutes do to the breathalyzer to ensure that Anderson did not burp, vomit, or belch.[2] Peccorini told Anderson he was going to play him an administrative license suspension ("ALS") recording of Anderson's "rights and responsibilities while going through a DUI investigation." *Id*. at 12:41. Peccorini explained, "if you do get arrested tonight for DUI, you will get a copy of this that has everything on there, but as of right now you are just getting the audio recording." *Id*. at  12:42–:51.

---

[2] "The best way of running a breathalyzer is to have a period of observation of the subject fifteen minutes before the test[.]" *United States v. Brannon*, 146 F.3d 1194, 1196 (9th Cir. 1998) (citing Kurt M. Dubowski, *Quality Assurance in Breath-Alcohol Analysis*, 18 J. Analytical Toxicology 306 (1994)). "The reason for the fifteen-minute observation period is to ensure that any potential mouth alcohol, which can skew the breathalyzer results, will have dissipated before breath samples are taken." *United States v. McAdams*, 2019 WL 214915, at *4 (E.D. Cal. Jan. 16, 2019).

As Peccorini guided Anderson to his patrol vehicle, Anderson complained he was claustrophobic, so Peccorini left Anderson's passenger door open to accommodate him. Anderson and Peccorini thereafter engaged in conversation. Anderson told Peccorini he was in Idaho because his father was sick with prostate cancer. Peccorini later asked Anderson, "have you ever been in trouble with the law or anything like that?" *Id*. at 18:00–:03. Anderson responded that he had "about six" drug charges, and that some involved felonies. *Id*. at 18:12–:20. Anderson explained he "got in trouble for cocaine and meth." *Id*. at 18:24–26. When Anderson admitted he had prior felonies, Peccorini requested Anderson's criminal history from dispatch, and asked dispatch to specifically check for any crimes that would prohibit Anderson from owning a firearm. *Id*. at 18:30–37.

During the fifteen-minute waiting period, CPD Officer Wallin arrived at the scene. Wallin walked to Anderson's car and shined his flashlight through the windows to look for items in plain view. While doing so, Wallin observed a Ziplock-style baggie in the driver's side door pocket that looked like drug paraphernalia. This led Wallin to suspect that there might be controlled substances inside Anderson's car. When Wallin reported his observation to Peccorini, *id*. at 21:45–:57, Peccorini called for a drug sniffing K9. *Id*. at 22:06–:16. During the fifteen-minute waiting period, dispatch also advised Peccorini that Anderson had felony convictions in 2016 and 2018, and was thus a prohibited possessor of firearms. *Id*. at 28:30–29:45.

When Peccorini learned Anderson was a prohibited possessor, he advised Anderson that some new issues, "other than this DUI investigation," had arisen. *Id*. at 29:51–:55. Peccorini continued, "so you said you have a firearm in the vehicle, right?" *Id*. at 29:57.

When Anderson responded affirmatively, *id*. at 29:58, Peccorini questioned "are you supposed to be in possession of a firearm?" *Id*. at 30:00. Anderson responded that his "rights" to possess firearms had been restored. *Id*. at 30:03. Anderson then said, "but, the firearms are . . . the one I know of . . the one, the one I have is a BB gun, which is under the seat." *Id*. at 30:09–:15. Anderson confirmed there could be firearms in his car because the vehicle belonged to his girlfriend, who did own firearms. *Id*. at 30:18–30:24.

At the conclusion of the fifteen-minute waiting period, Anderson provided two breath samples, both of which were negative. *Id*. at 30:51. However, near the end of the fifteen-minute waiting period, CPD Officer Pyell arrived at the scene with his K9. Dkt. 23-8. Shortly thereafter, the K9 alerted to the odor of drugs inside Anderson's vehicle. The parties dispute whether the K9 alerted before or after Peccorini administered the second breathalyzer test.

Although Anderson's breath samples both resulted in a .00 breath alcohol content, officers searched Anderson's car when the K9 alerted. Dkt. 23-1, at 1. In the center console, they discovered a loaded Ruger .45 caliber pistol, a bag of marijuana with a glass bong, and a glass pipe containing methamphetamine residue. In a safe sitting on the passenger floorboard, officers found 23.93 grams of actual Methamphetamine, 10.99 grams of Fentanyl in the form of blue pills, a mason jar full of Marijuana, clear plastic baggies, and a scale. Dkt. 27, at 7. Officers also located a digital scale and a Ziplock baggie containing screws and bolts in the driver's side door, and a BB gun under the passenger seat. Dkt. 23-3, at 3; Dkt. 47, at 182:1–5. After the search, Anderson was *Mirandized* and arrested.

## B. Procedural Background

On March 10, 2021, Anderson was indicted with one count of unlawful possession of a firearm. Dkt. 1. On September 15, 2021, the Government filed a Superseding Indictment, charging Anderson with one count of unlawful possession of a firearm and one count of possession with intent to distribute Methamphetamine and Fentanyl.[3] Dkt. 17. Anderson filed the instant Motion to Suppress on December 22, 2021. Dkt. 23. After extensions requested by both parties, the Motion to Suppress became ripe on February 11, 2022. Dkt. 31. In his Reply in support of the Motion to Suppress, Anderson stated an expert on FSTs would testify that Peccorini failed to properly administer the FSTs.

On March 3, 2022, Anderson filed a report from his law enforcement expert, Robert F. LaPier, as a Supplement to his Motion to Suppress. Dkt. 33. In his report, LaPier contends Peccorini did not properly administer the modified HGN test, the standard HGN test, or the one-leg stand test. *Id*. On May 4, 2022, the Government filed a Motion in Limine to exclude LaPier's testimony at the evidentiary hearing. Dkt. 38.

In its Motion in Limine, the Government argued LaPier's testimony was irrelevant because the question of whether Peccorini had reasonable suspicion to conduct a DUI investigation turned on what he learned from the reporting party and from his own observations of Anderson. The Government argued LaPier's testimony should be excluded because Peccorini had reasonable suspicion to conduct a DUI investigation regardless of

---

[3] The Government filed a Second Superseding Indictment on August 9, 2022. Dkt. 53. The Second Superseding Indictment charges Anderson with one count of unlawful possession of a firearm, one count of possession with intent to distribute Methamphetamine and Fentanyl, and one count of possession of a firearm in furtherance of a drug trafficking crime. *Id*.

the modified HGN and FSTs.

During the evidentiary hearing, the Court explained it would allow LaPier to testify but would reserve ruling on whether LaPier's testimony was admissible until it issued the instant written decision. Following the evidentiary hearing, the parties submitted their closing arguments on June 3, 2022, via simultaneous written briefs. Dkt. 49; Dkt. 50.

### III. LEGAL STANDARDS

#### A. Motion in Limine

"Motions in limine are well-established devices that streamline trials and settle evidentiary disputes in advance, so that trials are not interrupted mid-course for the consideration of lengthy and complex evidentiary issues." *Miller v. Lemhi Cty.*, 2018 WL 1144970, at *1 (D. Idaho Mar. 2, 2018) (quoting *United States v. Tokash*, 282 F.3d 962, 968 (7th Cir. 2002)). "The term 'in limine' means 'at the outset.' A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009) (quoting Black's Law Dictionary 803 (8th ed. 2004)).

Courts may exclude testimony during evidentiary hearings or at trial. *United States v. Gomez*, 846 F.2d 557, 559 (9th Cir. 1988). This includes criminal proceedings, as "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) ("[T]he proposition that the Due Process Clause guarantees the right to introduce all relevant evidence is simply indefensible.").

Because "[a]n in limine order precluding the admission of evidence or testimony is an evidentiary ruling," *United States v. Komisaruk*, 885 F.2d 490, 492 (9th Cir. 1989), a district court has broad discretion in ruling on a motion in limine. *United States v. Ravel*, 930 F.2d 721, 726 (9th Cir. 1991). Further, since in limine rulings are preliminary, they "are not binding on the trial judge [who] may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000).

### B.  Motion to Suppress

Anderson argues law enforcement violated the Fourth Amendment by unlawfully detaining and arresting him, and the Fifth Amendment by subjecting him to a custodial interrogation without first advising him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

#### 1. *Fourth Amendment*

The Fourth Amendment guarantees the right of individuals to be secure "in their persons, houses, papers, and effects, against all unreasonable searches and seizures under the guise of law." *Mapp v. Ohio*, 367 U.S. 643, 648 (1961) (citation omitted). Generally, searches and seizures conducted without a warrant are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (citations omitted). Three exceptions to the warrant requirement are relevant in this case.

First, in *Terry v. Ohio*, 392 U.S. 1, 30 (1968), the Supreme Court held that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is

dealing may be armed and presently dangerous," the officer may briefly stop the suspicious person and make "reasonable inquiries" aimed at confirming his suspicions. An investigatory stop must be both "justified at its inception," and "reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. at 20.

A traffic stop is more like a *Terry* stop than a formal arrest. *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). Officers may temporarily "seize" a driver to investigate a traffic violation. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id*. (cleaned up). Any deviations or delays for unrelated investigations violate the Fourth Amendment unless the reason for the delay is supported by independent reasonable suspicion. *Id*. at 354–55.

Second, "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckcloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citations omitted). When the government relies upon consent to justify the lawfulness of a search, it has the burden of showing the consent was freely given. *Id*. at 222.

And third, the automobile exception to the warrant requirement permits police to search a vehicle when the car is "readily mobile" and "probable cause exists to believe it contains contraband." *United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008) (citation omitted). "The police may search an automobile and the containers within it where they

have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991). "Because this exception is justified by the exigency created by the inherent mobility of vehicles as well as the relatively minimal expectation of privacy that exists with respect to automobiles, the automobile exception does not turn on whether the car's owner or driver has already been taken into custody or the risk of mobility has otherwise been eliminated." *United States v. Scott*, 705 F.3d 410, 417 (9th Cir. 2012) (citations omitted).

In the absence of an exception to the warrant requirement, evidence seized during a warrantless search must be excluded. Further, evidence discovered through the "exploitation of" an illegal search or seizure must also be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). Evidence qualifies as "fruit of the poisonous tree" when "the illegal activity tends to significantly direct the investigation to the evidence in question." *United States v. Johns*, 891 F.2d 243, 245 (9th Cir. 1989) (quoting *United States v. Chamberlin*, 644 F.2d 1262, 1269 (9th Cir. 1980)).

2. *Fifth Amendment*

The Fifth Amendment provides "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. The Fifth Amendment's prohibition against compelled self-incrimination requires that a criminal suspect must be given *Miranda* warnings prior to a custodial interrogation. *United States v. Brady*, 819 F.2d 884, 887 (9th Cir. 1987) (citing *Miranda*, 384 U.S. at 444–45). Whether a suspect is "in custody" for *Miranda* purposes turns on whether there is a formal arrest or restraint on freedom of movement to the degree associated with a formal arrest. *United States v.*

*Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (citations omitted). When a suspect is subjected to a custodial interrogation without first being advised of his rights, "*Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief." *Oregon v. Elstad*, 470 U.S. 298, 317 (1985).

## IV. ANALYSIS

### A.  Motion in Limine (Dkt. 38)

The Government argues LaPier's testimony is irrelevant because Peccorini had both reasonable suspicion to conduct a DUI investigation, and Anderson's implied consent to perform a breathalyzer, even absent the results of the modified HGN and FSTs. As such, the Government contends the intricate procedures and scoring requirements of the FSTs are irrelevant. In his response to the Motion in Limine, Anderson argues LaPier's testimony is critical unless the Government is willing to concede that neither the modified HGN nor the standardized FSTs provided reasonable suspicion to detain, and probable cause to arrest, Anderson. The Government has not so conceded.

Pursuant to Federal Rule of Evidence 401, evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. The Court finds LaPier's testimony is relevant to two issues: (1) whether the modified HGN test could contribute to Peccorini's reasonable suspicion that Anderson was driving under the influence; and (2) despite Anderson's implied consent, whether Peccorini also had probable cause to administer a breathalyzer given Anderson's performance during the FSTs. LaPier's testimony is accordingly relevant under Federal Rule of Evidence 401, and the Government's Motion

in Limine is DENIED.

**B. Motion to Suppress (Dkt. 23)**

In his Motion to Suppress, Anderson contends law enforcement: (1) lacked reasonable suspicion to conduct FSTs; (2) lacked probable cause to administer a breathalyzer; (3) lacked probable cause to arrest him; (4) subjected him to a custodial interrogation without first advising him of his *Miranda* rights; and (5) unreasonably prolonged his detention to accomplish an unrelated investigation and K9 sniff. The Court addresses each contention in turn.

*1. Reasonable Suspicion to Conduct FSTs*

A police officer must have reasonable suspicion that a driver is under the influence in order to conduct FSTs. *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1207 (10th Cir. 2008). While Anderson admits his erratic driving initially justified Peccorini's investigation, he suggests the passage of time and the presence of additional facts effectively dispelled any reasonable suspicion to extend the stop. Dkt. 23, at 10. For instance, Anderson contends the report of erratic driving was "easily explained by the fatigue that a large segment of the law-abiding population might experience after driving for long distances at night in sometimes difficult snowstorm conditions." *Id*. In addition, Anderson argues Peccorini lacked reasonable suspicion to prolong the investigation because Anderson denied he was under the influence of alcohol or drugs, acknowledged he had swerved but attributed this to fatigue, had no difficulty exiting his vehicle or walking, did not smell of alcohol, did not slur, did not have glassy or bloodshot eyes, did not appear nervous or combative, and complied with Peccorini's instructions. *Id*.

The Government counters that Peccorini *did* observe Anderson had slightly bloodshot eyes, and notes the modified HGN test also revealed some evidence of impairment. In addition, the reporting party notified police that while following Anderson's car, he observed Anderson driving in both lanes of traffic, hitting curbs, and almost driving over a sidewalk and off a bridge. Dkt. 23-3. The Government suggests the totality of such facts provided reasonable suspicion to detain Anderson for a DUI investigation and to prolong the stop to administer the FSTs.

Reasonable suspicion "exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (emphasis in original). The requirement for particularized suspicion encompasses two elements. *Id*. First, the assessment must be based on the totality of the circumstances. *Id*. Second, the totality of the circumstances assessment "must arouse a reasonable suspicion that the particular person being stopped has committed or is about to commit a crime." *Id*. (cleaned up). The level of reasonable suspicion required for an investigative stop "is obviously less demanding than that for probable cause," and "merely requires some minimal level of objective justification." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *INS v. Delgado*, 466 U.S. 210, 217 (1984)).

"In making a determination of probable cause, the relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts. That principle applies equally well to the reasonable suspicion inquiry." *Sokolow*, 490 U.S. at 10 (quoting *Illinois v. Gates*, 462 U.S. 213, 243–

MEMORANDUM DECISION AND ORDER - 14

44 n. 13 (1983)). Thus, conduct that is not necessarily indicative of criminal activity may be relevant to the reasonable suspicion calculus. *United States v. Wardlow*, 528 U.S. 119, 125 (2000). However, innocent conduct does not support reasonable suspicion unless there is other information or surrounding circumstances of which the police are aware, which, when considered along with the otherwise innocuous conduct, tend to indicate criminal activity has occurred or is about to take place. *People of the Territory of Guam v. Ichiyasu*, 838 F.2d 353, 355 (9th Cir.1988).

Here, there were multiple facts to support Peccorini's reasonable suspicion that Anderson was driving while impaired. Peccorini testified that Anderson's reported erratic driving pattern was significant because it "was very extreme. It was not just a simple swerving or speeding. It was going over curbs and almost driving off bridges." Dkt. 46, at 32:24–33:3. The behavior alleged by the reporting party, "viewed from the standpoint of an objectively reasonable police officer, amounted to reasonable suspicion of drunk driving." *Navarette v. California*, 572 U.S. 393, 402 (2014) (cleaned up). The reporting party identified "more than a minor traffic infraction and more than a conclusory allegation of drunk or reckless driving." *Id*. at 403. The extreme nature of Anderson's erratic driving suggested "lane-positioning problems, decreased vigilance, impaired judgment, or some combination of those recognized drunk driving cues." *Id*.

Anderson also exited the roadway and parked in front of a closed store at approximately 10:30 p.m. He was there long enough for the reporting party to follow him and park, and long enough for the police to reach the scene and observe Anderson's vehicle. When Peccorini approached Anderson, Peccorini noted, "it's just kind of weird you being

here at night, it's a closed business." Dkt. 23-4, at  0:30–:34. Although such conduct was not alone suspicious, it became so when viewed in conjunction with the reporting party's observations regarding Anderson's apparent impairment. "[P]olice officers do not operate in a vacuum. Conduct that alone may appear innocent can be suspicious" when, as here, "viewed in the context of other information or surrounding circumstances" of which the police are aware. *Ichiyasu*, 838 F.2d at 355–56 (citing *United States v. Cortez*, 449 U.S. 411, 419 (1981)); *Gates*, 462 U.S. at 243 n. 13 ("[I]nnocent behavior will frequently provide the basis for a showing of probable cause").

Viewed together with the aforementioned facts, Peccorini also obtained independent reasonable suspicion to extend the stop to administer FSTs. *Rodriguez*, 575 U.S. at 354–55. For instance, when Peccorini advised Anderson that a concerned citizen had witnessed him "swerving on the roadway and not really able to maintain [his] lane," Anderson corroborated the reporting party's statement by admitting he had been swerving. Dkt. 23-4, at 0:36–47. During the evidentiary hearing, Peccorini explained the fact that Anderson admitted to swerving was significant because "someone that can recognize that they are swerving on the roadway means that it must have been very severe[.]" Dkt. 46, at 33:04–15. While Anderson argues his fatigue and long drive through a snowstorm explained his erratic driving, the relevant inquiry is not whether Anderson could counter law enforcement's observations with an innocent explanation, but rather whether, under the totality of the circumstances, the facts gave rise to reasonable suspicion. *Sokolow*, 490 U.S. at 9 (holding that factors which by themselves were "quite consistent with innocent travel" collectively amounted to reasonable suspicion); *United States v. Arvizu*, 534 U.S. 266, 277

(2002) ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct.").

After Anderson admitted that he had been swerving, Peccorini observed Anderson's slightly bloodshot eyes and performed the "modified HGN test," which revealed "some nystagmus at maximum deviation in both eyes." Dkt. 23-2, at 2. Although Anderson challenges Peccorini's "makeshift HGN test," as well as Peccorini's conclusion that Anderson's eyes were bloodshot, the Court finds, for several reasons, that such factors gave Peccorini independent reasonable suspicion to administer the FSTs. Dkt. 23, at 3; Dkt. 31, at 3–4.

First, LaPier testified that Peccorini's modified HGN test was improper because Anderson was still seated in his car, rather than standing, when Peccorini performed the test. Dkt. 47, at 201:1–18. Yet, the National Highway Traffic Safety Administration manual upon which LaPier relied states the HGN test can be performed on a suspect who is in multiple positions, and even lying down. *Id*. at 239:12–17. LaPier agreed that it was possible to check for nystagmus with the modified test Peccorini utilized, *id*. at 239:24–25, and also agreed that field sobriety tests may be modified to some extent and still be useful. *Id*. at 240:15–21. In light of his own expert's testimony that it is possible to test for nystagmus with the modified test Peccorini utilized, the Court rejects Anderson's argument that the modified HGN test is irrelevant because it was not administered according to standardized procedure. Dkt. 31 at 3 n. 2.

Second, while performing the modified HGN test in this case, Peccorini observed nystagmus in both of Anderson's eyes. Dkt. 23-2, at 2. Although not a standardized test,

the modified HGN test contributed to reasonable suspicion that Anderson was driving while impaired. *Alabama v. White*, 496 U.S. 325, 330 (1990) (explaining reasonable suspicion can arise from information different in quality and content and less reliable than that required to establish probable cause). As LaPier repeatedly acknowledged, reasonable suspicion is based on the totality of the circumstances, and an officer can use a number of techniques—including a variety of FSTs that are not standardized—to assess whether there is reasonable suspicion to launch a full DUI investigation. Dkt. 47, at 232:8–236:25.

Third, Peccorini testified that he has personally found the modified HGN test to be a reliable investigative technique, and one that CPD procedures support. Dkt. 46, at 95:19–23; 112:04–20. The reasonable suspicion determination "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them[.]" *Arvizu*, 534 U.S. at 273.

Fourth, although bloodshot eyes may be "common," as Anderson suggests, and would not alone support reasonable suspicion, Peccorini noted in his narrative report that Anderson's eyes were bloodshot, Dkt. 23-2, at 2, and testified that bloodshot eyes are a factor CPD officers "always look for" when doing DUI investigations because alcohol consumption causes bloodshot eyes. Dkt. 46, at 33:21–34:4. While bloodshot eyes may also have an innocent explanation, Anderson's bloodshot eyes were another factor that added to Peccorini's suspicion that Anderson was driving while impaired. *Arvizu*, 534 U.S. at 273; *United States v. Aruiza-Andrade*, 379 F. Supp. 3d 1130, 1138 (D. Or. 2019) (finding suspect's bloodshot eyes contributed to investigating officer's reasonable suspicion that suspect was driving under the influence).

Finally, there were a number of other facts which also supported Peccorni's reasonable suspicion to proceed with a DUI investigation. Specifically, after he administered the modified HGN test, Peccorini went back to his car to contact the reporting party. Peccorini told the reporting party both that he did not have enough evidence to charge Anderson with a DUI, and that Anderson said he was merely tired. The reporting party disagreed, explaining he had experience with fatigued driving because he used to drive a semi-truck, and he did not believe Anderson was merely "sleepy driving." Dkt. 23-6, at 2:01–2:06. The reporting party emphasized, "the way he was driving . . . he about wiped me out, and he about went off the bridge." *Id.* at 1:25–:29. The reporting party asked Peccorini to proceed with a DUI investigation, and stated he would sign a complaint for DUI if Peccorini found additional grounds to support that offense. *Id.* at 2:07–:25.

This subsequent call with the reporting party enhanced Peccorini's reasonable suspicion that Anderson was driving under the influence. Information from an eyewitness which contains certain "indicia of reliability" can support reasonable suspicion. *Adams v. Williams*, 407 U.S. 143, 147 (1972). Indicia of reliability may include whether or not the tip was anonymous. *Id*. Where, as here, the informant willingly identifies himself, there "is a stronger case than obtains in the case of an anonymous telephone tip." *Id.* at 146.

Additional indicia of reliability included: (1) the reporting party's insistence that Anderson's erratic driving pattern was too severe to be explained by fatigue; (2) the reporting party's willingness to sign a complaint should the officers determine that Anderson was driving under the influence; (3) the fact the reporting party had witnessed Anderson's dangerous driving and was concerned enough to call the police, to follow

Anderson into the O'Reilly's parking lot, and to wait at the scene until police arrived; (4) the detail the reporting party was able to provide regarding the color and make of Anderson's vehicle, as well as his Washington license plates; and (5) Anderson's admission to swerving on the roadway. *White*, 496 U.S. at 331 (finding information was sufficiently reliable to support reasonable suspicion where facts mentioned by anonymous caller were independently corroborated by the police); *Gates*, 462 U.S. at 234 (explaining an informant's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight"). The Court finds the reporting party's initial and subsequent statements were reliable and contributed to Peccorini's reasonable suspicion that Anderson was driving under the influence.

In sum, under the totality of the circumstances, including Anderson's reported driving pattern (which Anderson himself corroborated), Anderson's prolonged stop in a parking lot late at night, the evidence of nystagmus in both of Anderson's eyes Peccorini observed while administering the modified HGN test, the fact Anderson's eyes were also bloodshot, the reporting party's subsequent statements regarding Anderson's driving, and the reporting party's willingness to identify himself and to sign a complaint, gave rise to reasonable suspicion that Anderson was driving while impaired. The Court therefore concludes that Peccorini lawfully prolonged the traffic stop in order to conduct FSTs.

### 2. *Probable Cause to Administer Breathalyzer*

Anderson next argues Peccorini lacked probable cause to subject him to a breathalyzer test. Administering a breathalyzer is a search under the Fourth Amendment,

and generally requires probable cause. *Skinner v. Ry. Labor Exec. Ass'n*, 489 U.S. 602, 616–17 (1989); *Burnett v. Municipality of Anchorage*, 806 F.2d 1447, 1450 (9th Cir. 1986). Probable cause is a "practical, non-technical conception" under the facts and circumstances of a particular case. *Gates*, 462 U.S. at 231. Probable cause requires only that there be a "fair probability," not a "hard certaint[y]" that evidence of a crime will be discovered in the place to be searched. *Id*. at 231, 238. "[T]he determination of probable cause is based on the totality of the circumstances known to the officers at the time of the search." *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001).

 a. <u>Implied Consent</u>

 Probable cause is not required if the person subjected to a breathalyzer consents to the search. *Schneckloth*, 412 U.S. at 222. The Government contends—and Anderson does not dispute—that Anderson consented to a breathalyzer under Idaho's implied consent law. *See State v. Pool*, 457 P.3d 890, 894 (Idaho 2019) ("Absent express consent, all fifty states, including Idaho, have adopted implied consent laws as a condition for exercising the privilege of driving upon the states' roads and highways."). The Supreme Court has recognized that implied consent statutes are one type of "a broad range of legal tools to enforce their drunk-driving laws and to secure [blood alcohol concentration] evidence without undertaking warrantless nonconsensual blood draws." *Missouri v. McNeely*, 569 U.S. 141, 160–61 (2013).

 Under Idaho Code section 18-8002(1), any person who drives on an Idaho roadway consents to evidentiary testing if an officer has reasonable grounds to believe that the individual is an impaired driver. Pursuant to this code section, any person who drives a

motor vehicle within Idaho "*shall* be deemed to have given his consent to evidentiary testing . . . for the presence of drugs or other intoxicating substances[.]" Idaho Code § 18-8002(1) (emphasis added). This testing is required at the "request of a peace officer having reasonable grounds to believe that person has been driving or was in actual physical control of a motor vehicle" in violation of Idaho's DUI laws. *Id*. Evidentiary testing may include an analysis of a person's breath. Idaho Code § 18-8002(A)(e). A driver's consent is found when a driver has given their initial consent by voluntarily driving on Idaho roads, and has not revoked their consent by refusing, objecting to, or protesting evidentiary testing. *State v. Ortega-Vastida*, 392 P.3d 42, 44 (Id. Ct. App. 2017)

To be voluntary, "consent based upon Idaho's implied consent statute must overcome two hurdles: (1) drivers [must] give their initial consent voluntarily; and (2) drivers must continue to give voluntary consent." *Pool*, 457 P.3d at 895 (citing *State v. Charlson*, 377 P.3d 1073, 1080 (Idaho 2016)). The Government bears the burden of proving by a preponderance of the evidence that consent was voluntary. *United States v. Matlock*, 415 U.S. 164, 177 (1974). Whether consent was voluntary is determined by examining the totality of the circumstances. *Schneckloth*, 412 U.S. at 227.

With respect to the first element of the implied consent test—that a driver must give his initial consent voluntarily—the Idaho Supreme Court has reiterated that "drivers in Idaho give their initial consent to evidentiary testing by driving on Idaho roads voluntarily." *Charlson*, 377 P.3d at 1080. When there is no evidence that a driver *involuntarily* drove on an Idaho road, the government need not affirmatively prove that the defendant drove voluntarily. *Id.* Similarly, a driver is deemed to continue to give voluntary

consent when there is no evidence that he affirmatively withdrew consent. *Id*. at 1081. Thus, absent evidence to suggest a defendant withdrew his implied consent to testing, a court may infer from the totality of the circumstances that the suspect's consent to evidentiary testing was voluntary under Idaho Code section 18-8002. *Id.*

Here, it is undisputed that Anderson was driving voluntarily on Idaho's roads at the time of his erratic driving. Anderson does not suggest he drove in Idaho as a result of coercion, duress, or something similar. *Id*. at 1080. Nor does Anderson contend he revoked his consent by refusing, objecting to, or protesting evidentiary testing. Thus, under the totality of the circumstances, Anderson voluntarily consented to evidentiary testing, and probable cause was not required to administer the breathalyzer. *Id*. at 1081.

b. The FSTs

Moreover, even if Anderson did not give his implied consent to the breathalyzer, the results of standard field sobriety tests may be considered to determine whether probable cause exists. *United States v. Horn*, 185 F. Supp. 2d 530, 534 (D. Md. 2002); *see also United States v. Stanton*, 501 F.3d 1093, 1101 (9th Cir. 2007) (finding officers had probable cause to arrest suspect for DUI where, *inter alia*, suspect failed two FSTs). After the reporting party asked him to continue with a DUI investigation, Peccorini performed three FSTs: a standard HGN test, a walk and turn test, and a one-leg stand test. Anderson argues negligently performed FSTs cannot be the basis for probable cause, and contends Peccorini incompetently performed the standardized HGN test and the one-leg stand test.[4] Dkt. 23,

---

[4] Anderson passed the walk and turn test. The Court accordingly addresses only the two tests that Anderson failed.

at 11 (citing *Strickland v. City of Dothan,* 399 F. Supp. 2d 1275 (M.D. Ala. 2005)). The testimony of Anderson's own expert, LaPier, illustrates otherwise.

LaPier testified that while Peccorini did not use the appropriate instructions, Peccorini did a "fine job" with his technique in executing the standard HGN test. Dkt. 47, at 240:24–241:02. LaPier explained Peccorini did not use the appropriate instructions because he did not tell Anderson to "keep his head still, look at the stimulus, and keep looking at the stimulus until he's told the test is over." *Id*. at 202:06–08. On cross-examination, LaPier confirmed that Peccorini told Anderson follow his finger with his eyes only, *id*. at 242:21–24, that Anderson did keep his head still during the entire test, *id*. at 242:25–243:02, and that Anderson kept looking at the stimulus the entire time until the test was over. *Id*. at 243:03–05. LaPier's quibble, then, is one of semantics, rather than negligence in the actual test Peccorini administered. While keeping his head still and following Peccorini's finger with his eyes only, Anderson showed a lack of smooth pursuit with distinct and sustained nystagmus at maximum deviation in both eyes, and distinct and sustained nystagmus onset prior to 45 degrees in his left eye. Dkt. 23-2, at 2. As a result, Anderson failed 5 out of 6 decision points on the standardized HGN test.

LaPier's criticism of Peccorini's one-leg stand test is similarly grounded in semantics. In his written report, LaPier concluded Peccorini's instructions were inadequate because he did not tell Anderson to hold his foot "parallel" to the ground during the test. Dkt. 33, at 4. Yet, during the evidentiary hearing, the Government played the instruction portion of the test during which Peccorini instructed Anderson to hold his foot "horizontal" to the ground. Dkt. 47, at 249:19–25. LaPier admitted there was no difference between the

standard instruction and the instruction Peccorini administered. *Id*. at 250:01–07. To the extent he objected to other aspects of Peccorini's instructions, LaPier also testified that specific words are not required during the instruction portion of each FST if the steps are clearly explained to the suspect. *Id*. at 195:7–13, 241:19–23. Moreover, LaPier agreed that a drug recognition evaluation would have "absolutely" been warranted under the circumstances. *Id*. at 252:23–25.

Peccorini's body camera footage illustrates that he clearly explained the steps of the standardized HGN test and one-leg stand tests to Anderson, and that Anderson followed the requisite instructions while taking—and failing—two of the three tests. In conjunction with each of the facts recounted above with respect to reasonable suspicion, that Anderson failed two FSTs provided probable cause to perform the breathalyzer even if Anderson had not also given his implied consent.[5] *Stanton*, 501 F.3d at 1101.

### 3. The "Arrest"

After he failed two FSTs, Anderson was handcuffed, searched, and placed into the back of Peccorini's patrol vehicle against his will. Dkt. 23-6, at 10:49–11:30. Anderson contends that, given the extensive limits placed on his freedom and the lack of justification for the degree of these restraints, the investigatory stop was converted into a full-fledged arrest for which probable cause was required, but was lacking. Dkt. 23, at 13 (citing *United*

---

[5] LaPier's criticism of other aspects of the tests—such as Peccorini's alleged failure to account for Anderson's physical impairments—is misplaced. While the purported deficits in the FSTs may preclude a finding of guilt beyond a reasonable doubt for DUI based upon the test results alone, the results do not preclude a finding of probable cause, which is a much lower standard than guilt beyond a reasonable doubt. *See, e.g., Borunda v. Richmond*, 885 F.2d 1384, 1389 (9th Cir. 1988). Further, Anderson was never charged with a DUI offense, and the Government is not required to prove that he is guilty of a DUI.

*States v. Del Vizo*, 918 F.2d 821, 824–25 (9th Cir. 1990)).

There is "no bright-line rule for determining when an investigatory stop crosses the line and becomes an arrest." *United States v. Parr*, 843 F.2d 1228, 1232 (9th Cir. 1988) (citation omitted). Instead, when "evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). Whether an arrest has occurred depends on the totality of the circumstances, and each case must be decided on its own facts. *United States v. Baron*, 860 F.2d 911, 914 (9th Cir. 1998); *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

In general, an investigatory detention becomes an arrest if "a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave." *United States v. Pinion*, 800 F.2d 976, 979 (9th Cir. 1982); *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988) ("we review the situation from the perspective of the person seized"). However, the "Supreme Court has permitted limited intrusions on a suspect's liberty during a *Terry* stop to protect the officer's safety[.]" *United States v. Alvarez*, 899 F.2d 833, 838 (9th Cir. 1990) (citing *United States v. Hensley*, 469 U.S. 221, 235 (1985)). As such, "an investigatory stop will not be converted into an arrest simply when officers take 'reasonable measures to neutralize the risk of physical harm and to determine whether the person in question is armed.'" *DelVizo*, 918 F.2d at 825 (quoting *Alvarez*, 899 F.2d at 838).

The latter inquiry is undertaken from the objective "perspective of law enforcement," while bearing in mind that "the purpose of a *Terry* stop is to allow the officer

MEMORANDUM DECISION AND ORDER - 26

to pursue his investigation without fear of violence[.]" *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009) (citations omitted); *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001) ("We allow intrusive and aggressive police conduct without deeming it an arrest when it is a reasonable response to legitimate safety concerns on the part of arresting officers") (cleaned up). Further, a "brief but complete restriction of liberty, if not excessive under the circumstances, is permissible during a Terry stop and does not necessarily convert the stop into an arrest." *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) (citing *United States v. Patterson*, 648 F.2d 625, 632–34 (9th Cir. 1982)).

The Government argues handcuffing, searching, and moving Anderson to Peccorini's patrol car was necessary so Peccorini could safely perform the breathalyzer and exhaust the requisite fifteen-minute waiting period prior to administering the breathalyzer. During the evidentiary hearing, Peccorini testified that when Anderson exited his vehicle for the FSTs, Peccorini observed a black nylon pistol holder on Anderson's right hip. Dkt. 46, at 43:23–25. The holster was empty, which led Peccorini to believe there was a weapon inside Anderson's vehicle. *Id.* at 44:01–05. Peccorini explained viewing the empty gun holster made him fear for his safety because:

> Knowing that a possible suspect in a DUI would have access to a weapon in close proximity where I don't know where the weapon is, I can't confirm if it's secure or not, I don't know anything about the weapon, it's going to make me want to control his movements more and make sure I know where he is and what he's doing at all times.

*Id.* at 44:8–13.

After Anderson failed two of the three FSTs, Peccorini told Anderson that he was detained and placed him in handcuffs. Peccorini stated he did so because:

The next step of [the DUI investigation] requires a Breathalyzer sample, where I'm standing within very close proximity, approximately 1 foot, 2 foot from the suspect.[6] If the suspect's not detained at that point, that opens them up to being able to attack me . . . especially with there already being an admission of a firearm inside the vehicle.[7] It made me wary that there was going to possibly be—that he would want to fight me and then get into his vehicle, where he had the firearm[.]

*Id*. at 47:07–15.

Given the close proximity of the suspect, Peccorini testified that it is standard CPD practice in all DUI investigations to handcuff a suspect prior to a breathalyzer, and confirmed he was trained to do so even when a suspect has not been placed under arrest. *Id*. at 49:19–20:09. Although Peccorini put Anderson in his patrol vehicle, he left the passenger seat door open during the entire detention to accommodate Anderson's professed claustrophobia. *Id*. at 53:11–13; Dkt. 23-6, at 11:10–30:51. When playing Anderson an audio recording of his rights and responsibilities during the DUI investigation, Peccorini also stated, "if you do get arrested tonight for DUI, you will get a copy of this . . . but as of right now you are just getting an audio recording." Dkt. 23-6, at 12:42–13:00. Peccorini thus conveyed that Anderson was not yet under arrest.

---

[6] For instance, taking the breath sample required Peccorini to inspect Anderson's mouth "for any foreign objects, gum, anything of that sort," and to observe Anderson for fifteen minutes to ensure he did not burp, vomit, or belch, as doing so could introduce alcohol into the mouth and require restarting the waiting period. *Id*. at 48:14–19, 49:06–10.

[7] While Anderson stated there was BB gun in his car when Peccorini viewed the empty handgun holder, Peccorini testified that based on his firearms training with the police and military, as well as his personal experience, it was unlikely a grown man would use a pistol holster to carry a BB gun. *Id*. at 59:01–15. Further, Peccorini had no way of knowing whether Anderson was telling the truth about what type of gun was in the vehicle.

Under the totality of the circumstances, including Anderson's two failed FSTs, the empty pistol holder on Anderson's hip, Anderson's admission that there was at least a BB gun in the car, Peccorini's fear that Anderson may have a firearm and become combative, the fact that it is standard CPD policy to handcuff suspects during a breathalyzer given the close proximity required during both the fifteen-minute waiting period and administration of a breathalyzer, that Peccorini allowed Anderson to keep the passenger seat door open to accommodate his claustrophobia,[8] and the fact that Peccorini conveyed to Anderson that he was *not* under arrest, the Court finds the investigatory stop did not become an arrest when Anderson was handcuffed, searched, and seated in Peccorini's patrol vehicle. Such measures were reasonable to neutralize Peccorini's reasonable fear for his safety and were far less severe restraints than those utilized in multiple Ninth Circuit cases finding that no arrest occurred. *See, e.g., Allen*, 66 F.3d at 1057 (pointing a gun at suspect, forcing him to lie on the ground, handcuffing him, and detaining him in a vehicle for twenty-four minutes did not constitute an arrest where suspect was intoxicated and had been a passenger in a vehicle during a high speed chase through a dangerous area at night); *Alvarez*, 899 F.2d at 838 (explaining suspect was not under arrest when officers ordered him out of his vehicle with their guns drawn because police had reason to believe suspect was armed with explosives); *United States v. Jacobs*, 715 F.2d 1343, 1346 (9th Cir. 1983) (finding investigative stop did not become an arrest when officer pointed his gun at suspect and

---

[8] This fact illustrates Peccorini was not aggressive and that Anderson retained some of his liberty during the investigation. *United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014) ("In looking at the totality of the circumstances, we examine . . . the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted.").

MEMORANDUM DECISION AND ORDER - 29

ordered her to "prone out" since officer was informed that suspect was possibly armed and under the influence); *United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir. 1987) (holding police conducted an investigatory stop and not an arrest when defendants were "forced from their car and made to lie down on wet pavement at gun point" because defendants were suspected of planning a bank robbery and were potentially dangerous); *United States v. Taylor*, 716 F.2d 701, 708 (9th Cir. 1983) (finding investigatory stop was not transformed into an arrest even where suspect was ordered to lie face down in a ditch— where he was handcuffed and frisked—because suspect was potentially dangerous, disobeyed orders to raise his hands, and made furtive movements inside the car where his hands could not be seen).

In sum, Peccorini had reason to believe that Anderson was under the influence and potentially armed, and thus reasonably feared for his safety. Further, given the close proximity required for the breathalyzer and the facts supporting reasonable suspicion recounted above, the steps Peccorini took to secure Anderson for the breathalyzer were justified and did not convert the investigatory stop into an arrest.

### 4. The "Custodial Interrogation"

Anderson next argues he was subjected to a custodial interrogation during the fifteen-minute waiting period, that he was not given his *Miranda* warnings prior to this time, and that any statements he made prior to being read his *Miranda* rights must accordingly be suppressed. The Court disagrees.

Interrogation initiated by law enforcement officers after a suspect "has been taken into custody or otherwise deprived of his freedom of action in any significant way" must

be preceded by *Miranda* warnings. *Miranda*, 384 U.S. at 444. To determine whether a suspect was subjected to a custodial interrogation, courts consider "the language used by the officer to summon the individual, the extent to which he or she is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention and the degree of pressure applied to the individual." *Bautista*, 684 F.2d at 1292 (citation omitted). Although inherently coercive, investigative detentions "do not usually involve the type of police dominated or compelling atmosphere which necessitates Miranda warnings." *Id.* at 1291 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). In *Mathiason*, the Supreme Court explained:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question . . . . Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which Miranda by its terms was applicable, and to which it is limited.

*Id*.

As explained above, Anderson was not arrested, or subjected to a restraint on his freedom of movement to the degree associated with a formal arrest, because Peccorini had a reasonable fear for his safety which necessitated handcuffing Anderson and placing him in the patrol vehicle. *Alexander v. Cty. of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995) ("It is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable" in the course of a *Terry* stop).

MEMORANDUM DECISION AND ORDER - 31

Further, each of the factors outlined in *Bautista* weigh *against* finding Anderson was in custody during the fifteen-minute waiting period. 684 F.2d at 1292. First, when detaining Anderson, Peccorini noted he believed Anderson was under the influence of something and needed to submit to a breathalyzer, but conveyed to Anderson that he was not yet under arrest for a DUI. Dkt. 23-6, at 12:40–12:50. The language used to detain Anderson thus weighs against finding he was subjected to a custodial interrogation.

Second, Anderson implies Peccorini confronted him with evidence of his guilt because Peccorini "confronted him with a failed HGN test." Dkt. 23, at 14. However, Peccorini did not tell Anderson that he had failed the standard HGN test until Anderson asked Peccorini if he was being detained for the breathalyzer because he had put his leg down during the one-leg stand test. Dkt. 23-6, at 10:56–10:58. Peccorini responded, "it was actually the eye test that you failed; you showed five out of six signs of impairment." *Id*. at 10:59–11:04. Peccorini did not confront Anderson with evidence of his guilt but rather responded to an inquiry Anderson initiated.

Next, although Peccorni asked Anderson a few questions during the fifteen-minute waiting period, this duration was necessitated in order to obtain an accurate breathalyzer result,[9] and not because Anderson was being questioned. And, although Anderson was handcuffed for officer safety, Peccorini never unholstered his weapon while Anderson was questioned, and Peccorini also took steps, such as leaving the passenger door seat open, to lessen the coercive nature of the situation. Thus, both the duration of the detention and the

---

[9] *See*, *supra*, text accompanying note 2.

degree of pressure to which Anderson was subjected weigh against finding he was subjected to a custodial interrogation.

Finally, although Anderson was seated in Peccorini's vehicle when Peccorini asked him questions, the location of the interrogation was decidedly less coercive than the police station. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (finding the roadside questioning of a motorist detained for a DUI investigation was "substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in Miranda itself, and in the subsequent cases in which we have applied Miranda."); *United States v. Baron*, 860 F.2d 911, 915 (9th Cir. 1988) (explaining unlike a transport to the police station, a *Terry*-stop is not transformed into a de facto arrest when a defendant is moved from the street to the back of a police car).[10]

Given Peccorini's reasonable fear for his safety and each of the *Bautista* factors, the Court finds Anderson was not subjected to a custodial interrogation, and *Miranda* warnings were not required during the fifteen-minute waiting period. Any statements Anderson made during this period are therefore admissible.

### 5. The K9 Alert

Anderson next argues Peccorini unreasonably prolonged the detention to

---

[10] Moreover, it is not entirely clear Anderson was subjected to an interrogation at all. Peccorini testified that he and Anderson engaged in "casual conversation" during the requisite fifteen-minute waiting period. Dkt. 46, at 53:13–14. Peccorini explained he would not describe the conversation as an interrogation because he "had no reason to interrogate [Anderson] about any other crime besides DUI at [the] time." *Id*. at 53:22–23. Peccorini had not yet run a criminal history report, and did not know Anderson was a prohibited possessor when Watkins asked Anderson what type of gun he carried, Dkt. 23-6, at 11:38, when Anderson responded, "a couple," *id*. at 11:41, when Peccorini asked Anderson whether he had a couple of guns in his vehicle, *id*. at 11:41–46, or Peccorini asked Anderson if he had ever been in trouble with the law. *Id*. at 18:00–:03.

accomplish an unrelated investigation and K9 sniff. The Government argues the K9 alert

occurred during the fifteen-minute waiting period, but that even if the alert occurred shortly

thereafter, officers had reasonable suspicion to investigate additional drug and gun crimes,

and to extend the stop for a K9 sniff.

In *Illinois v. Caballes*, 543 U.S. 405, 410 (2005), the Supreme Court held the Fourth

Amendment does not require reasonable, articulable suspicion to justify using a drug-

detection dog to sniff a vehicle during a legitimate traffic stop. The defendant in *Caballes*

was stopped for speeding while another officer walked his dog around the defendant's car

and obtained a positive alert for drugs. *Id*. at 406. The Supreme Court determined, "[a] dog

sniff conducted during a concededly lawful traffic stop that reveals no information other

than the location of a substance that no individual has any right to possess does not violate

the Fourth Amendment." *Id*. at 410. In so holding, the Court explained:

> Official conduct that does not compromise any legitimate interest in privacy
> is not a search subject to the Fourth Amendment. We have held that any
> interest in possessing contraband cannot be deemed legitimate, and thus,
> governmental conduct that only reveals the possession of contraband
> comprises no legitimate privacy interest. This is because the expectation that
> certain facts will not come to the attention of authorities is not the same as
> an interest in privacy that society is prepared to consider reasonable.

*Id*. at 408–09 (cleaned up).

However, the tolerable duration of a traffic stop "must be temporary and last no

longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S.

491, 500 (1983). *Rodriguez*, 575 U.S. at 354 (finding a dog sniff is not "an ordinary incident

of a traffic stop," so an officer may conduct a dog sniff that is not supported by independent

reasonable suspicion of drug activity only if doing so does not unreasonably prolong the

duration of the detention). Anderson argues "even though the DUI investigation was over, Peccorini would not be deterred from completing a suspicionless drug investigation." Dkt. 23, at 16. Anderson suggests the continued delay "of at least a minute"[11]—between his negative breathalyzer result and the drug dog's positive alert on the vehicle—was a clear Fourth Amendment violation under *Rodriguez*. *Id*. Again, the Court disagrees.

An officer may prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion. *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015) (holding that by conducting an ex-felon registration check and a dog sniff, both of which were unrelated to the traffic violation for which defendant was stopped, officers prolonged the traffic stop beyond the time required to complete the mission of the traffic stop, and thus violated the Fourth Amendment, unless there was independent reasonable suspicion to justify each prolongation); *United States v. Landeros*, 913 F.3d 862, 867 (9th Cir. 2019) ("*Rodriguez* requires that a traffic stop may be extended to conduct an investigation into matters other than the original traffic violation only if the officers have reasonable suspicion of an independent offense") (citing *Rodriguez*, 575 U.S. at 354).

Anderson argues *Rodriguez* held a traffic stop is unreasonably prolonged whenever an unrelated inquiry adds time to the top, even if it is "de minimis" or "incremental." Dkt. 23, at 15 (quoting *Rodriguez*, 575 U.S. at 356–57). This assertion is not exactly accurate. In *Rodriguez*, the defendant moved to suppress evidence seized during a traffic stop

---

[11] This time period is disputed. The Government argues the K9 alerted 15 to 20 seconds *before* the second breathalyzer test was administered, while Anderson contends the K9 alerted over a minute *after* the investigation concluded. Dkt. 49, at 7–8; Dkt. 50, at 5–8. The dispute is immaterial because the Court finds officers had reasonable suspicion to prolong the stop to investigate criminal activity beyond that which necessitated the initial traffic stop at the time the K9 alerted.

because the officer had purportedly prolonged the stop without reasonable suspicion to order a dog sniff. 575 U.S. at 352. A federal magistrate judge recommended that the motion be denied.

The district court agreed and concluded "dog sniffs that occur within a short time following the completion of a traffic stop are not constitutionally prohibited if they constitute only de minimis intrusions." *Id*. The Eighth Circuit also agreed, concluding, in turn, that the intrusion at issue was de minimis and permissible. *Id*. In light of this conclusion, however, the Eighth Circuit did not address the issue of reasonable suspicion. *Id*.

The Supreme Court granted certiorari in *Rodriguez* specifically to resolve the question of whether a law enforcement officer can "extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." *Id*. The Supreme Court ultimately held that law enforcement may not extend an otherwise completed traffic stop absent reasonable suspicion in order to conduct a dog sniff. *Id*. at 357–58. Because the Eighth Circuit had not analyzed whether there was reasonable suspicion, the Supreme Court remanded the case for further proceedings. *Id*. at 358 ("The question whether reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation, therefore, remains open for Eighth Circuit consideration on remand."). Anderson's argument thus misses a key phrase from *Rodriguez*: "absent reasonable suspicion." *Id*. Anderson's assertion that "a stop is unreasonably prolonged whenever an unrelated inquiry adds time to the stop, even if it is

'de minimis' or 'incremental'" should be prefaced with the critical clause "absent reasonable suspicion."

Here, law enforcement had reasonable suspicion of two additional crimes to justify prolonging the DUI investigation for a dog sniff. Specifically, during the fifteen-minute waiting period, Anderson said he had some felony drug charges. Such admissions led Peccorini to request a criminal report from dispatch to see if Anderson was a prohibited possessor. Dkt. 46, at 54:7–17. Before the fifteen-minutes had expired, dispatch confirmed that Anderson had several drug convictions prohibiting him from owning a firearm. *Id*. at 54:18–20. Based upon the empty handgun holster on Anderson's hip and Anderson's admission that he carried "a couple" of guns, Peccorini realized "there was possibly another crime besides DUI, particularly an unlawful possession investigation to perform." *Id*. at 55:01–05. Anderson also admitted that there may be firearms in his vehicle because he had borrowed the car from his girlfriend, who did own firearms. Dkt. 23-6, at 30:18–:25. Under the totality of such circumstances, Peccorni reasonably "believed that there could be firearms in [Anderson's] car" and was justified in extending the length of the traffic stop to investigate this independent violation of the law. Dkt. 46, at 55:04–05.

In addition, again during the fifteen-minute waiting period, CPD Officer Wallin joined Peccorini and Watkins at the scene to deliver a Lifeloc breathalyzer test. While waiting for Peccorini to administer the breathalyzer, Wallin decided to walk over to Anderson's vehicle and look for items in plain view. When he approached the front window, Wallin saw "a suspicious baggie in the [driver's side] door compartment" that he "believed to be drug paraphernalia." *Id*. at 135:11–17. Wallin testified he could see clearly

through the window with his flashlight. *Id*. at 135:23–136:04. He explained:

> There was something in particular that caught my attention. In the lower part of the driver's side door compartment, toward the seat, I saw a suspicious looking baggie that looked like it was hastily stowed in that compartment. I believed it to be there to be concealed from law enforcement contact or our point of view. It looked to be hazy in color, so kind of out of the ordinary, what I would describe as a Ziploc style baggie.

*Id*. at 136:14–21.

Wallin testified that the baggie was significant because it was like those he commonly sees on the street for the packaging of narcotics. *Id*. at 136:22–24. In addition, Wallin stated that in his drug investigation training and experience, individuals commonly stash drugs or other contraband in the driver's side door during a traffic stop. *Id*. at 137:04–10. When Wallin told Peccorni about the baggie, Peccorini requested a K9 unit to assist. Peccorini requested the K9 during the fifteen-minute waiting period, and it is undisputed that the K9 and its handler arrived at the scene before the breathalyzer was administered.

Wallin detailed his discovery of the Ziploc baggie in his police report. Dkt. 23-7. Further, Officer Watkins—who assisted with the search of Anderson's vehicle—testified that a baggie was found in the driver's side door. Dkt. 47, at 181:02. Although the baggie contained nuts and screws, *id*. at 182:01–05, and not drug paraphernalia, the issue is whether Peccorini had reasonable suspicion to extend the DUI investigation to investigate a drug crime, and not whether the baggie ended up containing drugs. *Gates*, 462 U.S. at 243 n. 13 ("innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens demands") (citation omitted);

MEMORANDUM DECISION AND ORDER - 38

*Montero-Camargo*, 208 F.3d at 1130 ("In short, conduct that is not necessarily indicative of criminal activity may, in certain circumstances, be relevant to the reasonable suspicion calculus."). Under the totality of the circumstances here, including Anderson's erratic driving, bloodshot eyes, failed FSTs, admission to a history of drug felonies, and the apparent evidence of drug paraphernalia in the driver's side door, Peccorini had reasonable suspicion to extend the stop for the minimal additional time needed to obtain the positive K9 alert on Anderson's vehicle.

In sum, even if, as Anderson argues, the DUI investigation was extended "by over a minute" between the second negative breathalyzer and the K9 alert, this extension was supported by reasonable suspicion of two independent crimes—unlawful possession of a firearm and drug possession. Dkt. 50, at 8. Thus, the prolongation of the stop, if any, did not violate Anderson's Fourth Amendment rights. *See Rodriguez*, 575 U.S. at 358.

### 6.  Search of Anderson's Vehicle

Finally, Anderson argues all evidence stemming from his purportedly unlawfully prolonged detention, including the contraband found in his vehicle, must be suppressed. The Court finds the search was not unlawfully prolonged. As such, the automobile exception to the warrant requirement supports the admission of the evidence located in Anderson's vehicle.

A warrantless search of an automobile is reasonable under the Fourth Amendment if officers have "probable cause to believe that the vehicle contains contraband" such that the "facts . . . would justify the issuance of a warrant, even though a warrant has not actually been obtained." *United States v. Ross*, 456 U.S. 798, 808–09 (1982); *see also United States*

*v. Williams*, 846 F.3d 303, 312 (9th Cir. 2016) ("Officers may conduct a warrantless search of an automobile, including containers within it, when they have probable cause to believe that the vehicle contains contraband or evidence of criminal activity."). To meet the probable cause requirement, the court must determine if, under the totality of the circumstances, there was a fair probability that contraband or evidence of a crime would be found in the car searched. *United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008) (citation omitted). A positive alert from a drug-detection dog provides such probable cause. *Florida v. Harris*, 568 U.S. 237, 247 (2013).

Anderson does not dispute the reliability of the K9 alert on his vehicle. In the absence of any dispute regarding the reliability of alert, the Court finds "all facts surrounding [the] dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id*. at 248. Thus, officers had probable cause to search Anderson's vehicle and the evidence located inside it is admissible. After the search of the vehicle revealed the drugs and gun that are the subject of the Second Superseding Indictment, Anderson was arrested and *Mirandized* before being subjected to any questioning.[12] Anderson's post-arrest statements are therefore also admissible.

## V. CONCLUSION

Under the totality of the circumstances, law enforcement had reasonable suspicion

---

[12] Anderson argues the evidence from the search of his car and his *Mirandized* statements must be suppressed because they were tainted by the unlawful prolongation of the investigative detention. Because the Court finds the investigative detention was not unlawfully prolonged, neither the evidence located in Anderson's vehicle, nor his *Mirandized* statements, are tainted.

to initiate a DUI investigation and probable cause to administer a breathalyzer. During the requisite 15-minute waiting period for the breathalyzer, Anderson was not arrested and was not subjected to a custodial interrogation. Further, during the fifteen minutes, officers obtained reasonable suspicion of additional drug and gun crimes. This independent reasonable suspicion justified the minimal prolongation of the traffic stop—if any— required to obtain a positive K9 alert on Anderson's vehicle. Given the alert, officers had probable cause to search Anderson's vehicle, and, upon discovery of Methamphetamine, Fentanyl, Marijuana, drug paraphernalia, and a loaded handgun, also had probable cause to arrest Anderson. Anderson was thereafter properly *Mirandized* and arrested.

In short, Anderson's Fourth and Fifth Amendment rights were not violated, and the Motion to Suppress is denied in its entirety.

## VI. ORDER

1. The Motion to Suppress (Dkt. 23) is **DENIED**;

2. The Motion is Limine (Dkt. 38) is **DENIED**.

DATED: August 24, 2022

David C. Nye
Chief U.S. District Court Judge